NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

Slip Opinion No. 2021-Ohio-4048

OHIO STATE BAR ASSOCIATION *v.* BRUNER.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio State Bar Assn. v. Bruner*, Slip Opinion No. 2021-Ohio-4048.]

*Attorneys—Misconduct—Disciplinary panel not bound by parties' stipulations of fact or misconduct—Multiple violations of the Rules of Professional Conduct, including failing to create or maintain client-trust-account records, failing to communicate with clients regarding the scope and nature of the representation and the basis or rate of fees and expenses, engaging in conduct that adversely reflects upon the lawyer's fitness to practice law, failing to notify clients of the lack of professional-liability insurance, and failing to disclose material facts during the disciplinary investigation—Two-year suspension and order to pay restitution.*

(No. 2020-1533—Submitted May 11, 2021—Decided November 17, 2021.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2019-048.

**Per Curiam.**

{¶ 1} Respondent, Harvey Bruce Bruner, of Cleveland, Ohio, Attorney Registration No. 0004829, was admitted to the practice of law in Ohio in 1974. In 2012, we imposed a conditionally stayed two-year suspension on Bruner based on his neglect and charging a clearly excessive fee in three client matters. *Ohio State Bar Assn. v. Bruner*, 133 Ohio St.3d 163, 2012-Ohio-4326, 976 N.E.2d 899.

{¶ 2} In August 2019, relator, the Ohio State Bar Association, charged Bruner with professional misconduct in six client matters and with failing to notify clients that he lacked professional-liability insurance for a period of more than seven years. A three-member panel of the Board of Professional Conduct heard the matter in October 2020. On the morning of the hearing, the parties filed stipulations of fact, misconduct, and aggravating and mitigating factors and 41 stipulated exhibits. The parties also jointly recommended that Bruner serve a two-year suspension with one year stayed.

{¶ 3} During the hearing, relator sought to withdraw charged rule violations that were not addressed in the parties' stipulations, and the parties agreed to amend the complaint to include rule violations that were included in the stipulations but were not charged in the complaint. Although the parties initially intended to submit the case on the stipulations and exhibits, relator ultimately called Bruner to testify on cross-examination. Bruner did not offer direct testimony or call any witnesses in his case in chief but requested—and was granted—additional time to file mitigating evidence posthearing.

{¶ 4} The panel found that Bruner had engaged in the stipulated misconduct and committed two violations of Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), even though relator had sought to withdraw the Prof.Cond.R. 8.4(c) charges. The panel recommended that we suspend Bruner's license for two years and order him

2

to pay restitution. The board issued a report adopting the panel's findings and recommended sanction.

{¶ 5} Bruner objects to the board's report, arguing that we should adopt only the parties' stipulations of misconduct or remand the matter to the board for an evidentiary hearing. For the reasons explained below, we dismiss one of the alleged Prof.Cond.R. 8.4(c) violations but otherwise overrule Bruner's objections and adopt the board's findings of misconduct and recommended sanction.

## I. Misconduct

### A. Count one—the Russell matter

{¶ 6} In April 2017, Theodore Russell retained Bruner to represent him in a criminal matter. About six months later, Russell filed a grievance against Bruner, alleging, among other things, that Bruner had been disrespectful to him. Russell recorded some of his conversations with Bruner, and in one of those conversations, Bruner threatened to make Russell's life miserable if he filed a grievance.

{¶ 7} During the disciplinary investigation, Bruner initially denied threatening Russell. But after being presented with Russell's recording, Bruner acknowledged that it was his voice on the recording. At his disciplinary hearing, Bruner testified that he had not remembered the conversation until relator played the recording for him. Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). We agree with the board's finding of misconduct.

### B. Count two—the Harb matter

{¶ 8} In 2017, Michael Harb filed a grievance against Bruner related to his court-appointed representation of Harb in a criminal matter. Bruner admitted that during relator's investigation of the grievance, he made inconsistent statements and failed to disclose material facts. Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 8.1(b) (prohibiting a lawyer from

failing to disclose a material fact in response to a demand for information from a disciplinary authority). We agree with the board's finding of misconduct.

*C. Count three—the Ortega matter*

{¶ 9} On March 5, 2016, Carlos Ortega Sr. and Rosa Ortega met with Bruner to discuss the possibility of any postconviction remedies for their son, who had been convicted of several felonies and sentenced to 27 years to life in prison. Bruner quoted the Ortegas a legal fee of $5,000, and Carlos paid Bruner $2,500 in cash.

{¶ 10} On April 21, 2016, Carlos met with Bruner again, and Bruner presented him with an invoice for $2,537.50. The Ortegas later filed a grievance against Bruner, arguing that he had not provided the legal services for which he had been paid, including filing a writ of habeas corpus in federal court on behalf of their son. Although Bruner maintained that he had never promised to file anything, Bruner admitted that he had not adequately communicated with Carlos about the scope of the work that he would perform for the initial $2,500 payment. Bruner also admitted that he had failed to create or retain any client-trust-account records relating to the representation or the advanced fee that he had obtained from Carlos.

{¶ 11} Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 1.5(b) (requiring a lawyer to communicate the nature and scope of the representation as well as the basis or rate of the fee and expenses within a reasonable time after commencing the representation) and 1.15(a)(2) (requiring a lawyer to maintain a record for each client on whose behalf funds are held). Bruner also stipulated and the board found that he owes $1,250 in restitution to Carlos.

{¶ 12} In addition, the board found that Bruner violated Prof.Cond.R. 8.4(c) in the Ortega matter, although relator had requested to withdraw this alleged rule violation at Bruner's disciplinary hearing. To support its finding, the board noted that Bruner's invoice to Carlos indicated that Bruner had performed work in the

4

Ortega matter on three separate days: March 25, April 2, and April 10. The board further noted that Bruner subsequently "stated that all of his work was done on March 12, then later said that he did not start working on this matter until March 30 and April 7." Thus, it appears that the board found that Bruner violated Prof.Cond.R. 8.4(c) based on contradictory statements about when he performed legal services for the Ortegas.

{¶ 13} Bruner objects to the board's finding of a Prof.Cond.R. 8.4(c) violation, arguing, among other things, that the board lacked authority to find a rule violation to which the parties had not stipulated. We conclude that the Prof.Cond.R. 8.4(c) violation must be dismissed, although not for the reasons set forth in Bruner's objections.

{¶ 14} Misrepresentation or dishonest conduct under Prof.Cond.R. 8.4(c) is a serious offense and like all rule violations, must be proven by clear and convincing evidence. *See* Gov.Bar R. V(12)(I); *Columbus Bar Assn. v. Keating*, 155 Ohio St.3d 347, 2018-Ohio-4730, 121 N.E.3d 341, ¶ 28. "The clear-and-convincing-evidence standard is actually an intermediate standard—'more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.' " *Disciplinary Counsel v. Stafford*, 128 Ohio St.3d 446, 2011-Ohio-1484, 946 N.E.2d 193, ¶ 55, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). Here, the board failed to identify in its report clear and convincing evidence supporting a Prof.Cond.R. 8.4(c) violation.

{¶ 15} As noted above, the board found that Bruner gave contradictory statements about the dates on which he had performed work for the Ortegas. To support its finding, the board cited several specific pages of the hearing transcript. But Bruner did not testify about the Ortega matter on those pages. In fact, Bruner never testified at his disciplinary hearing about specific dates on which he had performed work for the Ortegas.

**{¶ 16}** Nor could we find other clear and convincing evidence in the record to support the board's finding. The record includes transcripts from Bruner's June 2018 interview by relator and Bruner's February 2019 deposition. During the interview, Bruner initially stated that he had performed work in the Ortega matter on one day—the Saturday after his first visit with the Ortegas. But after locating his invoice for the Ortega matter, Bruner stated that he had performed the work on March 25 and April 2, as noted on the invoice. During Bruner's deposition, relator asked Bruner about his initial interview statement in which he reported having completed the work in one day. Bruner responded that "[i]t was probably a couple Saturdays" and that the dates on the invoice were accurate.

**{¶ 17}** The board made a specific factual finding: Bruner's invoice indicated that he had performed work on the Ortega matter on March 25, April 2, and April 10, but "[Bruner] stated that all of his work was done on March 12, then later said that he did not start working on this matter until March 30 and April 7." It is unclear to this court when Bruner made those alleged statements.[1] Considering that the board has failed to identify the evidence necessary to support this misconduct finding, we dismiss the Prof.Cond.R. 8.4(c) violation related to the Ortega matter. We otherwise adopt the board's findings that Bruner violated Prof.Cond.R. 1.5(b) and 1.15(a)(2) and overrule as moot Bruner's objections relating to the Ortega matter.

### D. Count four—the Jackson matter

**{¶ 18}** In September 2016, Derek Jackson entered a guilty plea in a criminal case, and in November, the court sentenced him to prison. On the day of his sentencing, Jackson—represented by the public defender's office—filed a motion

---

1. In Carlos's grievance, he alleged that when he had called Bruner on March 30 and April 7, Bruner stated that he had not yet reviewed the file. Thus, the allegations in Carlos's grievance also do not support the board's finding that Bruner stated that he had not started work on the matter until March 30 and April 7.

to withdraw his guilty plea, which the court denied. A few weeks later, Jackson retained Bruner to file another motion to withdraw his guilty plea. Jackson paid Bruner $1,500 by credit card before Bruner had performed any legal services on his behalf. Bruner admitted that he had failed to create or maintain any client-trust-account records relating to his representation of Jackson.

{¶ 19} Bruner filed a two-page motion and memorandum on Jackson's behalf but failed to cite any legal authority. He also failed to review the docket before filing his motion and was therefore unaware that Jackson's prior counsel had filed a similar motion that the court had already denied. Bruner admitted that he had failed to check the docket because he was recovering from surgery in a rehabilitation center.

{¶ 20} Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 1.1 (requiring a lawyer to provide competent representation to a client) and 1.15(a)(2). We agree with the board's findings of misconduct.

*E. Count five—the Herron matter*

{¶ 21} In 2010, James Herron, while represented by Bruner, pleaded guilty to rape and was sentenced to 12 years in prison. Bruner advised Herron that he would be eligible for judicial release in October 2016. In August 2017, Herron's brother paid Bruner $750 by credit card to file a motion for judicial release. Bruner admitted that he had failed to create or maintain any client-trust-account records relating to the payment or to his representation of Herron. Bruner filed the motion in October 2017, but it was denied. By statute, Herron's 12-year sentence was mandatory, and he was therefore ineligible for judicial release. Bruner refunded the $750 payment to Herron's brother.

{¶ 22} Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 1.1 and 1.15(a)(2). We agree.

*F. Count six—the Walton matter*

{¶ 23} In February 2016, Mary Walton paid Bruner $3,000 of an agreed-upon $5,000 fee to represent her son, Devonte Walton, who was incarcerated. Mary hired Bruner to find new evidence to file a motion for a new trial or perform other postconviction work. Mary later filed a grievance against Bruner, alleging that he had not completed any work on the matter. Bruner admitted that he had failed to inform Mary about the scope of the work that he would perform and that he had failed to adequately communicate with her about the basis of his fee. He also admitted that he had failed to create or maintain any client-trust-account records relating to the representation or to the funds that Mary had advanced to him.

{¶ 24} Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 1.5(b) and 1.15(a)(2). Bruner also stipulated and the board found that he owes $1,500 in restitution to Mary.

{¶ 25} In addition, the board found that Bruner violated Prof.Cond.R. 8.4(c)—although relator had sought to withdraw this charge at Bruner's disciplinary hearing. To support its finding, the board noted that Bruner claimed to have visited Devonte at the Ohio State Penitentiary in Youngstown on July 22, 2016, and September 30, 2016, and that he had charged Mary four hours for each visit, which included round-trip travel from Cleveland. But Devonte, the board found, was incarcerated at the Cuyahoga County jail on those dates—not the Ohio State Penitentiary—and the jail was only five minutes from Bruner's office.

{¶ 26} Bruner objects to the board's finding that he violated Prof.Cond.R. 8.4(c). For the reasons explained below, we conclude that Bruner's objections lack merit.

**1. The "functional equivalent of a consent to discipline" agreement**

{¶ 27} Bruner argues that the parties' stipulations were the "functional equivalent of a consent to discipline" agreement and the panel was therefore required to either (1) accept the stipulations or (2) reject them entirely and set the

matter for a full trial. The parties' stipulations, however, were neither a consent-to-discipline agreement nor the equivalent of one.

{¶ 28} Gov.Bar R. V(16) authorizes parties to enter into a written consent-to-discipline agreement wherein the respondent admits to alleged misconduct and the parties agree upon a sanction. Parties have an opportunity to bypass the hearing process if they enter into the agreement no later than 90 days after the appointment of the hearing panel, the agreement meets certain requirements, and the agreement is accepted by the panel, the board, and this court. If the agreement is rejected at any stage of the proceedings, the respondent is then entitled to a hearing. *Id.*; *see also* Gov.Bar R. V(17)(D)(1).

{¶ 29} The parties here filed stipulations on the day of the hearing—well past the deadline for a consent-to-discipline agreement—and did not meet the other requirements of Gov.Bar R. V(16). Stipulations are filed in many attorney-discipline matters and can help narrow contested issues and expedite the proceeding. But neither the panel nor this court are bound by the parties' stipulations of facts or misconduct. *See Cuyahoga Cty. Bar Assn. v. Veneziano*, 120 Ohio St.3d 451, 2008-Ohio-6789, 900 N.E.2d 185, ¶ 6; *Disciplinary Counsel v. Karp*, 156 Ohio St.3d 218, 2018-Ohio-5212, 124 N.E.3d 819, ¶ 15, fn. 2. And Bruner was notified both before and during his disciplinary hearing that the panel was not required to accept stipulated rule violations.

{¶ 30} Moreover, the parties' written stipulations did not address relator's charged Prof.Cond.R. 8.4(c) violation in the Walton matter. Instead, relator orally sought to dismiss all charged rule violations that were not mentioned in the parties' stipulations, including the Prof.Cond.R. 8.4(c) violation. But if a charge is otherwise supported by clear and convincing evidence, neither the panel nor this court is required to dismiss the charge merely because a relator attempts to withdraw it at the hearing. *See, e.g.*, *Akron Bar Assn. v. Holda*, 125 Ohio St.3d 140, 2010-Ohio-1469, 926 N.E.2d 626, ¶ 8 (relator's "withdrawal of the charge at

the disciplinary hearing did not preclude the panel from finding that respondent's admission at the hearing provided the requisite clear and convincing evidence that she had violated the rule"); *Cleveland Metro. Bar Assn. v. Mariotti*, 158 Ohio St.3d 522, 2019-Ohio-5191, 145 N.E.3d 286, ¶ 12.

{¶ 31} Contrary to Bruner's contention, the panel was not required to treat the stipulations as a consent-to-discipline agreement.

### 2. The sufficiency of the evidence

{¶ 32} Bruner also argues that the board misconstrued the facts in finding that he violated Prof.Cond.R. 8.4(c) in the Walton matter. According to Bruner, he did visit Devonte at the Ohio State Penitentiary in Youngstown—but in April 2016, not in July or September. In his objections, Bruner claims that after relator discovered the error in dates on his invoice, relator concluded that "Bruner was an awful historian and an awful record keeper—but not a liar" and therefore decided to withdraw the Prof.Cond.R. 8.4(c) charge.[2]

{¶ 33} The board, however, did not find that Bruner *never* visited Devonte at the penitentiary. Rather, the board found that Bruner claimed he had visited Devonte at the Ohio State Penitentiary and billed for traveling to the penitentiary on dates when Devonte was not housed there. We conclude that clear and convincing evidence supported this finding.

{¶ 34} During the disciplinary investigation, Bruner told relator on three occasions that he had visited Devonte at the Ohio State Penitentiary, even though at the time of those alleged visits, Devonte had been transferred to the custody of Cuyahoga County. In Bruner's February 2018 response to Mary's grievance, he submitted a copy of his invoice for the Walton matter, which showed that he had

---

2. In its answer to Bruner's objections, relator "vehemently disagrees" with Bruner's characterization of relator's motivation for seeking to withdraw the Prof.Cond.R. 8.4(c) charge. Relator avers that its request to withdraw the charge was a "strategic decision to compromise on a resolution" despite relator's belief that clear and convincing evidence supported a finding of a Prof.Cond.R. 8.4(c) violation.

billed four hours on July 22 and another four hours on September 30 for visiting Devonte "at [the] Ohio State Penitentiary." During a June 2018 interview with relator, Bruner stated that he had visited Devonte on July 22 and September 30 at the Ohio State Penitentiary and that part of the four hours that he had billed on those dates related to his round-trip travel from Cleveland to Youngstown. Similarly, at Bruner's February 2019 deposition, he testified under oath that he had a "specific recollection" of visiting Devonte at the Ohio State Penitentiary on July 22 and that two of the billed hours were for travel time. He also testified that on September 30, he had visited Devonte for a second time at the penitentiary.

{¶ 35} At his disciplinary hearing, Bruner conceded that prison records indicate that on July 7, 2016, Devonte had been transferred to the custody of Cuyahoga County, and he did not return to the Ohio State Penitentiary until October 12, 2016. Bruner denied falsifying his invoice and stated that he had made a mistake and provided incorrect dates on the invoice. Bruner maintained that he had visited Devonte at the Ohio State Penitentiary twice—once in April 2016 and on one other occasion, although Bruner did not know the exact date of the second visit and he had no record of it.

{¶ 36} The panel found that Bruner's hearing testimony was not credible. "Unless the record weighs heavily against a hearing panel's findings, we defer to the panel's credibility determinations, inasmuch as the panel members saw and heard the witnesses firsthand." *Cuyahoga Cty. Bar Assn. v. Wise*, 108 Ohio St.3d 164, 2006-Ohio-550, 842 N.E.2d 35, ¶ 24. The record here does not weigh heavily against the panel's finding. Therefore, Bruner has not established that the board lacked clear and convincing evidence to support its finding that he violated Prof.Cond.R. 8.4(c) in the Walton matter.

### 3. The panel's prehearing decisions

{¶ 37} Bruner additionally argues that if we do not adopt the parties' stipulations in their entirety, we must remand this matter for a full trial in the Walton

matter and reverse some of the panel's prehearing evidentiary decisions. Specifically, Bruner asserts that the panel erred and violated his due-process rights by (1) quashing his subpoena duces tecum to a member of relator's certified grievance committee, (2) denying his motion to compel Devonte's current counsel to comply with a subpoena, and (3) denying his motion to exclude relator's counsel.

{¶ 38} "The boundaries of due process for attorney-discipline proceedings are different from those in civil or criminal proceedings." *Disciplinary Counsel v. Tamburrino*, 151 Ohio St.3d 148, 2016-Ohio-8014, 87 N.E.3d 158, ¶ 21. A respondent's "due-process rights have been adequately protected as long as the respondent has been 'afforded a hearing, the right to issue subpoenas and depose witnesses, and an opportunity for preparation to explain the circumstances surrounding his actions.' " *Id.*, quoting *Disciplinary Counsel v. Character,* 129 Ohio St.3d 60, 2011-Ohio-2902, 950 N.E.2d 177, ¶ 76. Considering the totality of the proceedings here, we conclude that Bruner's due-process rights were adequately protected. Bruner had the opportunity to call witnesses, to testify on his own behalf, and to better explain why he issued an invoice charging for travel time to Youngstown on dates when Devonte was incarcerated in Cuyahoga County. Bruner, however, did not present any evidence in his defense on this matter—apparently because he was under the mistaken belief that the parties' stipulations resolved every issue for the panel. Due process does not require us to afford Bruner a second chance to argue his case. *See Disciplinary Counsel v. Maney*, 152 Ohio St.3d 201, 2017-Ohio-8799, 94 N.E.3d 533, ¶ 28.

{¶ 39} Nor has Bruner sufficiently explained how he was prejudiced by the panel's alleged errors. For example, Bruner argues that the panel misapplied the work-product doctrine in quashing his subpoena for memos written by Kevin Tierney, a member of relator's certified grievance committee. According to relator, Tierney initially investigated the Walton and Ortega grievances and in 2017, he issued two memos about his investigations. But sometime thereafter, relator

claims, it assigned two of its current counsel—James Manken and James Roberts, who were investigating some of the other grievances filed against Bruner—to conduct a new investigation of the Ortega and Walton grievances. During Manken's and Roberts's 2018 investigation, Bruner produced the invoice and made the false statements underlying the board's finding of a Prof.Cond.R. 8.4(c) violation in the Walton matter. Bruner has failed to sufficiently explain how Tierney's 2017 memos could have made any difference with respect to the Prof.Cond.R. 8.4(c) violation or why his inability to obtain those memos amounted to prejudicial error requiring a new hearing.

{¶ 40} Similarly, Bruner has not sufficiently explained why the panel erred in refusing to disqualify Manken and Roberts as relator's counsel. Bruner argues that allowing Manken and Roberts to serve as both factual investigators and lead counsel will create "extremely troubling precedent" in other areas of the law and that the panel's decision barred him from calling Manken and Roberts as fact witnesses. The panel's decision on this issue, however, is unlikely to impact areas outside of attorney-discipline matters. "A disciplinary proceeding is instituted to safeguard the courts and to protect the public from the misconduct of those who are licensed to practice law, and is neither a criminal nor a civil proceeding." *In re Judicial Campaign Complaint Against Carr*, 76 Ohio St.3d 320, 322, 667 N.E.2d 965 (1996). And Bruner's argument fails to account for the unique role of certified grievance committees in the attorney-discipline process. *See, e.g.*, Gov.Bar R. V(9)(C)(1) ("a certified grievance committee shall review and may investigate any matter filed with it or that comes to its attention and may file a complaint pursuant to this rule in cases where it finds probable cause to believe that misconduct has occurred"). Further, Bruner has not established why Manken's and Roberts's testimony was necessary, considering that the Prof.Cond.R. 8.4(c) violation was based on Bruner's invoice and his own statements during his 2018 interview and

2019 deposition—all of which were admitted into evidence by stipulation of the parties.

{¶ 41} We overrule Bruner's objections and adopt the board's findings that in the Walton matter, Bruner violated Prof.Cond.R. 1.5(b), 1.15(a)(2), and 8.4(c).

*G. Count seven—professional-liability insurance*

{¶ 42} Bruner did not maintain professional-liability insurance from the expiration of his 2007-2008 policy until April 29, 2016. Bruner admitted that during the seven-year period, he had failed to properly notify clients that he lacked professional-liability insurance. Based on this conduct, the parties stipulated and the board found that Bruner violated Prof.Cond.R. 1.4(c) (requiring a lawyer to inform a client if the lawyer does not maintain professional-liability insurance and to obtain a signed acknowledgement of that notice from the client). We adopt the board's finding of misconduct.

{¶ 43} We also dismiss any other rule violations alleged in relator's complaint that were not expressly dismissed by the hearing panel.

**II. Sanction**

{¶ 44} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 45} As aggravating factors, the board found that Bruner has prior disciplinary offenses, engaged in a pattern of misconduct, committed multiple offenses, and failed to make restitution in the Ortega and Walton matters. *See* Gov.Bar R. V(13)(B)(1), (3), (4), and (9). The board also found that the victims of Bruner's misconduct were vulnerable, *see* Gov.Bar R. V(13)(B)(8), his testimony was not credible, and he had "a rather cavalier attitude toward the truth." The board found one mitigating factor: Bruner submitted three letters from judges lauding his professionalism and competence. *See* Gov.Bar R. V(13)(C)(5).

{¶ 46} To support its recommended sanction, the board cited a number of cases involving attorneys who had committed multiple offenses similar to Bruner's, with sanctions ranging from an indefinite suspension to a partially stayed two-year suspension. For example, the board cited *Disciplinary Counsel v. Noel*, 134 Ohio St.3d 157, 2012-Ohio-5456, 980 N.E.2d 1008, in which we indefinitely suspended an attorney for misconduct that included making contradictory statements during the disciplinary process, failing to deposit client funds into his trust account, and failing to cooperate in two disciplinary investigations. The attorney had a prior disciplinary record. The board also reviewed *Columbus Bar Assn. v. Boggs*, 129 Ohio St.3d 190, 2011-Ohio-2637, 951 N.E.2d 65, in which we indefinitely suspended an attorney for failing to deposit client funds into his trust account, failing to properly notify clients that he lacked professional-liability insurance, neglecting two client matters, and charging two clients a clearly excessive fee. The attorney had two prior disciplinary cases.

{¶ 47} On the lower range of the spectrum, the board cited *Disciplinary Counsel v. Wallace*, 138 Ohio St.3d 350, 2014-Ohio-1128, 6 N.E.3d 1177, in which we suspended an attorney for two years with one year stayed based on his conduct in two matters relating to the same client. The attorney misappropriated funds from the client, failed to deposit the client's funds into his trust account, and failed to maintain client-trust-account records. The attorney had a prior disciplinary record but established the existence of three mitigating factors. The board also reviewed *Disciplinary Counsel v. Corner*, 145 Ohio St.3d 192, 2016-Ohio-359, 47 N.E.3d 847, in which we suspended an attorney for two years with one year conditionally stayed for misconduct that included misusing her client trust account, issuing incorrect settlement statements that inflated her fee, failing to maintain client-trust-account records, and failing to represent a client competently and diligently. Several mitigating factors were present, including the attorney's clean disciplinary record.

**{¶ 48}** The board found that on balance, the circumstances here are more egregious than those in *Wallace* and *Corner* but do not rise to the level of warranting an indefinite suspension. The board therefore recommended a two-year suspension, noting that Bruner "represents a continuing threat to the public."

**{¶ 49}** Without citing any precedent, Bruner argues that we should adopt the parties' recommended sanction of a two-year suspension with one year stayed. We conclude that the board's recommended sanction is appropriate. Bruner threatened a client, admittedly failed to disclose material facts during a disciplinary investigation, failed to competently represent two clients, failed to keep client-trust-account records, failed to explain the scope of his representation to multiple clients, engaged in dishonest conduct, and for a seven-year period, failed to properly notify clients that he lacked professional-liability insurance. This misconduct—combined with a profusion of aggravating factors, including previous discipline, compared to a single mitigating factor—warrants an actual two-year suspension. *See, e.g.*, *Warren Cty. Bar Assn. v. Marshall*, 113 Ohio St.3d 54, 2007-Ohio-980, 862 N.E.2d 519 (imposing an actual two-year suspension on an attorney who made a false statement to the relator during a disciplinary investigation and neglected two client matters; the attorney had prior discipline).

### III. Conclusion

**{¶ 50}** Harvey Bruce Bruner is hereby suspended from the practice of law in Ohio for two years. Within 90 days of our disciplinary order, Bruner shall provide proof to relator that he has made restitution in the amounts of $1,250 to Carlos Ortega Sr. and $1,500 to Mary Walton. Costs are taxed to Bruner.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FISCHER, MAYLE, and STEWART, JJ., concur.

BRUNNER, J., dissents, with an opinion joined by DEWINE, J.

16

CHRISTINE E. MAYLE, J., of the Sixth District Court of Appeals, sitting for DONNELLY, J.

————————————

**BRUNNER, J., dissenting.**

{¶ 51} I respectfully dissent from the majority opinion in this case. While this court is the ultimate arbiter of attorney-discipline matters, *see Ohio State Bar Assn. v. Reid*, 85 Ohio St.3d 327, 708 N.E.2d 193 (1999), paragraph one of the syllabus, I cannot support the board's recommendation in this case, because the disciplinary panel did not render procedural fairness—with its "surprise," late-hour rejection of the parties' efforts to resolve the matter without the necessity of a hearing. *See In re Ruffalo*, 390 U.S. 544, 551-552, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (admonishing against turning the attorney-disciplinary proceeding into a trap). The actions of the panel in this case give the appearance of inducing respondent, Harvey Bruce Bruner, to testify in order for the panel to accept the parties' stipulation agreement, but really, the panel's actions served to elicit testimony from Bruner, over the objections of his counsel, about matters he was unprepared to testify about. The panel then used that testimony to find that Bruner violated rules of professional conduct that relator, the Ohio State Bar Association, had requested to withdraw and then impose a sanction that was partially based on those additional violations. Our role is not only to promote public confidence in the state's judiciary but also to secure the confidence of the members of the bar. We require them to respect the judiciary. Prof.Cond.R., Preamble [5] ("A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials.").

{¶ 52} The flawed evidentiary process that occurred in this matter calls for remanding it to the board—to allow for a full evidentiary hearing or for additional time for the parties to file a consent-to-discipline agreement in conformance with our rules—or at a minimum, dismissing the violations found by the panel that were

outside of the parties' stipulation agreement and imposing a two-year suspension with one year stayed and ordering Bruner to pay restitution, as the parties had jointly recommended.

**Facts related to the procedural aspects of the hearing**

{¶ 53} It is clear that both relator and Bruner intended to use the stipulation agreement to resolve the matter and to waive any further hearing. Their unpreparedness to present testimony on the day of the hearing establishes this fact. Counsel for both relator and Bruner used the term "resolution" in describing their stipulations, a term that was probably inappropriate since only the panel could bring the matter to a resolution. Regardless, the proceeding began with the panel chair appearing to agree to proceed down that path.

{¶ 54} Counsel for relator briefed the disciplinary panel on the parties' efforts to provide the panel with a "joint resolution," calling the stipulations a

> comprehensive agreement, between the Relator and the Respondent which contains proposed stipulations relative to [the case], and includes facts, violations, mitigating and aggravating factors, restitution * * *, stipulated recommended sanctions, and case law which we believe justifies, ultimately, the recommendations in this case.

{¶ 55} Bruner's counsel agreed with this characterization of the stipulations, telling the panel,

> [W]e've propounded what you have received this morning, stipulations that we believe would resolve the case.

I think those stipulations are based on the state of the evidence, what could be proven, what the law says, and what a reasonable sanction would be for Mr. Bruner in this case. * * *

* * * And I think everybody believes that this is a fair resolution to this matter that would negate having the presentation of evidence for six days, calling witnesses * * *. We believe that this resolution takes care of all of those issues.

{¶ 56} The parties and the panel chair then clarified the violations to be considered, noting that the stipulations provided for some violations not contained in the complaint and omitted others. Relator proposed withdrawing the violations in the complaint that the parties agreed were unsupported by the evidence and then amending the complaint to include violations that the parties agreed to in their stipulations. The panel chair responded, "All right. So we — we can itemize what I think is not supported and make sure that *we're all in agreement on that.*" (Emphasis added.) After obtaining agreement from Bruner's counsel regarding this manner of proceeding, the panel chair remarked, "Very good."

{¶ 57} The panel chair then requested some testimony be presented to support the stipulated facts, directing the following commentary to relator's counsel:

[We] don't want to be in a position of telling you how to try your case, but you might want to give some consideration to at least inquiring of Mr. Bruner as to the – – the basis and background for the stipulations, his agreement to them, and – – and related matters.

If – – are you all prepared to go forward with *that kind of evidence* at this point?

(Emphasis added.)

{¶ 58} The parties requested clarification, appearing to be uncertain about what "that kind of evidence" might be—beyond the written stipulations and the parties' verbal agreement and acknowledgement. The panel chair explained:

> So, my expectation broadly would be that the parties might want to put, perhaps, Mr. Bruner on the witness stand to testify *as to the circumstances that underlie the – – the charges as amended by agreement here* and – – and authenticate the exhibits and make sure that we don't have any gaps. But that's about as far as I can go in telling you how to put your case on.

(Emphasis added.) After additional clarification was sought, the panel chair adjourned the hearing until early afternoon to afford the parties additional time to ensure they had witnesses ready to testify *in support of their stipulations*.

{¶ 59} Upon reconvening, relator called Bruner to testify regarding the stipulation agreement. Counsel inquired whether Bruner had signed the agreement and whether Bruner had entered the agreement voluntarily, knowingly, and with the advice of counsel. Bruner then authenticated the exhibits attached to the stipulations and agreed to their admission. And with little objection or clarification, Bruner agreed to the stipulations of fact and to the rule violations set forth in the stipulation agreement. Bruner was then asked about the aggravating factors and the recommended sanction in the stipulation agreement, all of which he had agreed to.

{¶ 60} At that point, it would appear that the relator had presented the information and evidence requested by the panel chair to support the parties' stipulation agreement. But thereafter, another panel member initiated a line of questioning to Bruner that was unrelated to the stipulations. Bruner's counsel attempted to object and when finally recognized by the panel, explained that his

objection was based on the questions being well outside of the stipulation agreement and dealing with violations that both parties had intentionally omitted from the stipulations in order to resolve the matter. Brunner's counsel expressed concern that the hearing was turning into a trial of the full matter, when the parties had entered into a stipulation agreement as to how to resolve the case.

{¶ 61} The panel chair overruled the objections, stating that "[t]he panel has the responsibility of addressing all of the information" that comes before it and that the panel had "not accepted the withdrawal of the charges that the Relator has not pursued." The panel ultimately found that Bruner had violated Prof.Cond.R. 8.4(c) in two separate client matters—both were rule violations that relator had sought to withdraw—and recommended that Bruner be fully suspended for two years and make restitution in certain matters.

**The procedural problems resulted in an unfair hearing**

{¶ 62} I recognize and agree with the majority that the parties' stipulations were not the equivalent of a consent-to-discipline agreement—the agreement was not timely filed, it did not contain the required affidavit of the respondent, and neither party sought leave to either file the agreement out of time or obtain an extension of the deadline to file the agreement. *See* Gov.Bar R. V(16)(A). As such, the panel was not required to give the parties' stipulation agreement the full force and effect due a consent-to-discipline agreement. However, once the panel chair limited the scope of the hearing to whether there was clear and convincing evidence to support the stipulations, the parties could not be expected to conduct a full evidentiary hearing.

{¶ 63} The panel chair indicated to the parties a number of times that he wished to conduct a hearing in order to establish clear and convincing evidence to support the stipulations and to allow the panel to accept them as a basis for the conduct violations. The panel chair further indicated that the hearing would be limited to the stipulated violations and confirmed that both parties agreed with

certain violations either being withdrawn from consideration or added by way of amending the complaint. Critically, the panel did not inform the parties that it would take the oral motion to withdraw violations under advisement; instead, the panel proceeded to obtain an oral agreement from all parties as to the proposed course of action for the proceeding. The panel chair reinforced proceeding on only the violations in the stipulation agreement when he explained that testimony from Bruner might be elicited as to "the charges as amended by agreement here."

{¶ 64} The parties, having jointly indicated their desire to waive the hearing, were reasonably confused when instructed to go forward. Generally, stipulations are admissions of fact that the panel may accept as true and do not require further evidentiary inquiry. *See Disciplinary Counsel v. Jackson*, 86 Ohio St.3d 104, 712 N.E.2d 122 (1999) (adopting the board's recommendations based on the parties' stipulations and agreed waiver of hearing). And because the parties had agreed to dispense with the hearing based on their stipulation agreement, Bruner was not prepared to testify. It appears that Bruner did so at the panel chair's suggestion and only to further ensure the acceptance of the agreement. Bruner's counsel, at the first prospect of his client testifying, proffered Bruner's agreement to the stipulations and the admissibility and authenticity of the exhibits.

{¶ 65} Bruner's counsel were likely cognizant of Bruner's right against self-incrimination and were reluctant to have him testify if not necessary. *See Spevack v. Klein,* 385 U.S. 511, 516, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (likening the threat of sanctions in a disciplinary hearing to those in a criminal matter and holding that "[l]awyers are not excepted from the words 'No person * * * shall be compelled in any criminal case to be a witness against himself' "). But Bruner had a duty to cooperate in the disciplinary process, *see* Prof.Cond.R. 8.1(b) and Gov.Bar R. V(9)(G), and we should recognize that he did so, even under these tenuous circumstances.

{¶ 66} Because the panel at first appeared to agree to the parties' stipulation-agreement approach but then elicited testimony that went beyond the agreement, I cannot join the majority opinion—I do not believe the hearing was a fair process. The majority finds support for the Prof.Cond.R. 8.4(c) violation in the Walton matter (a violation that relator had sought to withdraw before the panel) in testimony from Bruner elicited by panel member Caruso that was outside the scope of the stipulation agreement and over Bruner's counsel's objection, which was overruled by the panel chair. The ruling on the objection, absent other circumstances, could be found to be legally correct. But by changing the earlier established procedural parameters without notice, the panel denied Bruner a fair hearing.

{¶ 67} And while the panel could have denied relator's withdrawal of certain rule violations and considered evidence outside of the stipulation agreement, *see* Gov.Bar R. Appendix II, Regs. 2(B) and (C), it limited the counts that would be amended or withdrawn and narrowed the scope of the proceeding at its outset. Thus, those general rules no longer should have applied. Bruner was denied a fair hearing when those limitations were ignored and then used against him.

{¶ 68} The proper course for the panel was either to have held a full evidentiary hearing from the outset, accepted stipulations that would have alleviated the need for the presentation of evidence, admitted the parties' joint exhibits without further need for foundation or authentication, and considered the parties' legal analysis and overall cooperative efforts in reaching a final decision or accepted the parties' stipulation agreement and dispensed with the hearing. And while the parties should not have assumed that the panel would automatically accept their stipulation agreement and agreed waiver of hearing, they were not amiss to act on the statements of the panel on the first day of the hearing. The record shows that the matter was already scheduled for six days of hearing. If the

panel had a change of heart and wanted to hear more evidence, it could have given the parties the remainder of the day to prepare for a full hearing and resumed the hearing the next day.

{¶ 69} The totality of the proceeding, and the majority's approval of it, creates a disincentive for parties to cooperate to resolve a disciplinary case or even to narrow issues for a disciplinary panel, as these efforts may ultimately be used against them. I therefore dissent from the majority opinion and would remand this matter to the board for a full evidentiary hearing or to allow the parties additional time to file a consent-to-discipline agreement in conformance with our rules, or I would simply dismiss the violations found by the panel that were outside of the parties' stipulation agreement and impose a two-year suspension with one year stayed and order Bruner to pay restitution, as the parties had jointly recommended.

DEWINE, J., concurs in the foregoing opinion.

————————————

Desiree Blankenship, Bar Counsel; James Manken and James Roberts, for relator.

Michael J. O'Shea and Robert V. Housel, for respondent.

————————————