**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Toledo Bar Assn. v. Westmeyer*, **Slip Opinion No. 2024-Ohio-5196.]**

<u>NOTICE</u>

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5196

TOLEDO BAR ASSOCIATION *v.* WESTMEYER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Toledo Bar Assn. v. Westmeyer*, Slip Opinion No. 2024-Ohio-5196.]**

*Attorneys—Misconduct—Multiple violations of the Rules of Professional Conduct—Conditionally stayed 18-month suspension.*

(No. 2024-0489—Submitted July 9, 2024—Decided November 1, 2024.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2023-022.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, and DETERS, JJ. BRUNNER, J., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Joseph William Westmeyer III, of Toledo, Ohio, Attorney Registration No. 0071262, was admitted to the practice of law in Ohio in 1999.[1]

{¶ 2} In a five-count July 2023 complaint, relator, the Toledo Bar Association, alleged that Westmeyer had failed to honor "letters of protection" issued to a chiropractor who had treated two of his personal-injury clients; had failed to reasonably communicate with a third personal-injury client, to pursue the client's case with diligence, and to appropriately handle the client's settlement proceeds; had failed to notify his clients that he did not carry professional-liability insurance; and had committed professional misconduct in regard to the management of his client trust account. Westmeyer waived a probable-cause determination.

{¶ 3} In his answer, Westmeyer admitted some of the facts and misconduct alleged in relator's complaint. The parties later submitted stipulations of fact and misconduct (including 21 exhibits) and aggravating and mitigating factors, and they jointly recommended that Westmeyer be suspended from the practice of law for 18 months with the entire suspension stayed on the conditions that he complete certain CLE courses and work for one year with a monitoring attorney appointed by relator.

{¶ 4} The matter proceeded to a hearing before a three-member panel of the Board of Professional Conduct, at which Westmeyer was the only witness. Following the hearing, the panel issued an order dismissing four alleged rule violations. The panel found that Westmeyer had committed the stipulated misconduct and recommended that he be suspended from the practice of law for six months with the entire suspension stayed on the conditions that he complete the

---

1. According to Westmeyer's disciplinary-hearing testimony, he is also admitted to the United States District Court for the Northern District of Ohio, Western Division; the United States District Court for the Southern District of Michigan, Eastern Division; and the United States Court of Appeals for the Second Circuit.

CLE recommended by the parties and refrain from further misconduct. The board adopted the panel's report and recommendation.

{¶ 5} The parties filed joint objections to the board's recommended sanction, arguing that their proposed sanction of an 18-month conditionally stayed suspension is the proper sanction for Westmeyer's misconduct in this case. After reviewing the record, we adopt the board's findings of misconduct, sustain the parties' joint objection to the board's recommended sanction, and suspend Westmeyer from the practice of law for 18 months with the entire suspension stayed on the conditions recommended by the parties.

## MISCONDUCT

### Count I: The Meyers Matter

{¶ 6} Westmeyer represented Malik Meyers on a contingent-fee basis in a personal-injury matter that stemmed from a 2017 auto accident. Edward Schwartz, D.C., treated Meyers for injuries he had sustained in that accident. Westmeyer, Meyers, and Dr. Schwartz signed a letter of protection in which they agreed that Westmeyer would pay Dr. Schwartz out of the proceeds of any settlement or judgment in Meyers's case for the medical treatment Dr. Schwartz rendered to Myers.

{¶ 7} In March 2019, Meyers's case settled for $17,500, and the funds were deposited into Westmeyer's client trust account. Between July 2019 and February 2021, Westmeyer paid Meyers $11,666.67 from his client trust account, but he did not pay Dr. Schwartz the $4,296 in medical fees that Dr. Schwartz claimed he was owed. Westmeyer and relator stipulated that Meyers had wanted to negotiate a discount of the medical charges with Dr. Schwartz but that the doctor refused to negotiate directly with Meyers. Despite the signed letter of protection in which Westmeyer, Meyers, and Dr. Schwartz agreed that Westmeyer would be "solely responsible for negotiating with [Dr. Schwartz] for billing matters," Westmeyer

told Dr. Schwartz that he had paid the medical portion of the settlement to Meyers and that Dr. Schwartz would have to recover his medical fees directly from Meyers.

{¶ 8} In March 2021, Dr. Schwartz filed a grievance with relator, alleging that Westmeyer had failed to honor the letter of protection in the Meyers matter and letters of protection in two other matters, including the Hicks-Gover matter addressed in Count II below. Several months after the grievance was filed, Westmeyer mailed Dr. Schwartz a $2,500 check drawn on his client-trust-account, representing a discounted payment for Meyers's medical treatment. However, Dr. Schwartz denies having received that check, and that check was never cashed. In late November 2023, Westmeyer paid Dr. Schwartz in full for the medical services he had rendered to Meyers.

{¶ 9} The parties stipulated and the board found that Westmeyer's conduct violated Prof.Cond.R. 1.5(c)(2) (requiring a lawyer entitled to compensation under a contingent-fee agreement to prepare a closing statement to be signed by the lawyer and the client, detailing the calculation of the lawyer's compensation, any costs and expenses deducted from the judgment or settlement, and any division of fees with a lawyer not in the same firm), 1.15(d) (requiring a lawyer to promptly notify a client or third person that the lawyer has received funds in which the lawyer knows the client or third person has a lawful interest and to promptly deliver any funds that the client or third person is entitled to receive), and 1.15(e) (requiring a lawyer in possession of funds in which two or more persons claim an interest to hold those funds in his client trust account until the dispute is resolved). We adopt the board's findings of misconduct.

**Count II: The Hicks-Gover Matter**

{¶ 10} Westmeyer signed another letter of protection with Dr. Schwartz and a second personal-injury client, Annette Hicks-Gover, agreeing that Westmeyer would pay Dr. Schwartz out of the proceeds of any settlement or judgment in Hicks-Gover's personal-injury case for the medical treatment that Dr. Schwartz rendered

to Hicks-Gover. Dr. Schwartz charged $4,794 for Hicks-Gover's treatment. After settling the case in April 2020, Westmeyer prepared and had Hicks-Gover sign a settlement statement, which stated that Westmeyer was holding $3,200 of the settlement proceeds to pay Hicks-Gover's medical bills; however, Westmeyer did not contact Dr. Schwartz to negotiate a discounted fee for his medical services. In December 2023, more than two years after Dr. Schwartz filed his grievance with relator, Westmeyer paid Dr. Schwartz in full for the medical services he had rendered to Hicks-Gover. The parties stipulated and the board found that Westmeyer's conduct with respect to the Hicks-Gover matter violated Prof.Cond.R. 1.15(d).[2] We adopt that finding of misconduct.

### Counts III and V: The Mount Matter and Client-Trust-Account-Management Issues

{¶ 11} Westmeyer represented Kaitlyn Mount on a contingent-fee basis in a personal-injury matter arising from a 2019 incident in which Mount, as a pedestrian, was struck by a truck. In December 2019, the case settled for $100,000, and Westmeyer deposited the settlement proceeds into his client trust account. Around that time, Mount began receiving communications from creditors asserting liens for medical care that had been provided to Mount following the accident. Over the next 20 months, Mount repeatedly requested that Westmeyer update her on the status of her personal-injury claim, provide her with a summary of the liens, and tell her when she could expect distribution of the settlement proceeds.

{¶ 12} Frustrated because Westmeyer had not provided any meaningful response to her inquiries or distributed any portion of the settlement proceeds to her, Mount sought the assistance of attorney Richard Cuneo. Cuneo attempted to contact Westmeyer by phone, email, and U.S. Mail from September through

---

2. In its report, the board appears to have inadvertently identified the charged violation of Prof.Cond.R. 1.15(d) as a violation of Prof.Cond.R. 1.5(d); however, the board's description of the rule that Westmeyer violated matches Prof.Cond.R. 1.15(d).

November 2021; he requested, among other things, an accounting of the settlement proceeds, a list of Mount's medical bills and whether they had been settled, and a timeline for the distribution of Mount's share of the settlement proceeds. Westmeyer spoke with Cuneo on several occasions and responded in writing to *some* of Cuneo's concerns. In a November 6, 2021 letter to Cuneo, Westmeyer explained that although Mount's case had settled for the $100,000 insurance-policy limits, he was continuing to negotiate the outstanding subrogation lien, which exceeded $288,000. In mid-December 2021, Mount filed a grievance against Westmeyer.

{¶ 13} In May 2022, Cuneo sent Westmeyer a letter from Mount by email and U.S. Mail terminating Westmeyer's representation and requesting the release of her file and the proceeds of her settlement that remained in his possession. Westmeyer denied receiving that communication. Having received no response from Westmeyer by mid-August 2022, Cuneo sent another letter demanding that Westmeyer turn over Mount's file and settlement proceeds. Several days later, Westmeyer hand-delivered to Cuneo's law office Mount's file and a $100,000 check payable from his client trust account to Cuneo's client trust account.

{¶ 14} Although Westmeyer initially claimed that he was entitled to a $33,333.33 attorney fee for representing Mount, at his disciplinary hearing, he testified that he had not collected and would not pursue a fee. Westmeyer stipulated that he failed to maintain for each client for whom he held funds a record identifying all receipts and disbursements made on the client's behalf for seven years after the termination of the representation or final disbursement of the funds. He also stipulated that he failed to perform monthly reconciliations of his client trust account and failed to timely distribute the funds to his clients and other persons who were entitled to receive them.

{¶ 15} Westmeyer acknowledged that he deposited Mount's $100,000 settlement proceeds into his client trust account on December 20, 2019, and that he

did not make any distributions of Mount's settlement proceeds until August 22, 2022, when he transferred the entire amount to Cuneo. He also stipulated that the balance in his client trust account dropped to $90,090.63 by December 31, 2019, and that it dropped as low as $46.22 as of January 1, 2022. Moreover, Westmeyer acknowledged that the balance in his client trust account remained under $100,000 until August 2, 2022, when he deposited another client's $250,000 settlement check. In his testimony before the hearing panel, Westmeyer explained that the $100,000 that he had transferred to Cuneo (representing Mount's entire settlement) was actually the attorney fee he had earned from that $250,000 settlement.

{¶ 16} The parties stipulated that Westmeyer "commingled funds by not having an account balance of at least $100,000.00 in his [client] trust account" from the time he deposited Mount's settlement proceeds into his client trust account in December 2019 until he transferred those funds to Cuneo in August 2022. And the board made a similar finding.

{¶ 17} The parties stipulated and the board found that Westmeyer's conduct with respect to the Mount matter violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(3) (requiring a lawyer to keep a client reasonably informed about the status of a matter), 1.4(a)(4) (requiring a lawyer to comply as soon as practicable with a client's reasonable requests for information), 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separately from the lawyer's own property), and 1.15(d).

{¶ 18} In addition, the parties stipulated and the board found that Westmeyer's conduct with respect to his client trust account violated Prof.Cond.R. 1.15(a) (requiring a lawyer to preserve required client-trust-account records for seven years after termination of the representation or the appropriate disbursement

of such funds or property, whichever comes first),[3] 1.15(a)(2) (requiring a lawyer to maintain a record for each client that sets forth the name of the client; the date, amount, and source of all funds received on behalf of the client; and the current balance for each client), 1.15(a)(5) (requiring a lawyer to perform and retain a monthly reconciliation of the funds held in the lawyer's client trust account), and 1.15(e)[4] (requiring a lawyer to promptly distribute all funds or other property as to which the interests are not in dispute).  We accept the board's findings of misconduct.

### Count IV: Professional-Liability Insurance

{¶ 19} Westmeyer has stipulated that he did not maintain professional-liability insurance before or during his representation of Meyers, Hicks-Gover, or Mount and that he did not inform his clients in writing or otherwise of that fact. The parties stipulated and the board found that that conduct violated Prof.Cond.R. 1.4(c) (requiring a lawyer to inform a client if the lawyer does not maintain professional-liability insurance).

### RECOMMENDED SANCTION AND THE PARTIES' JOINT OBJECTIONS

{¶ 20} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 21} In this case, the parties stipulated and the board found that the aggravating factors consist of Westmeyer's pattern of misconduct, multiple offenses, and the vulnerability of and resulting harm to the victims of his

---

3. Although relator did not charge Westmeyer with a violation of this portion of Prof.Cond.R. 1.15(a) in its complaint, Westmeyer has stipulated and testified that his conduct violated this rule.
4. In its report, the board appears to have inadvertently identified the charged violation of Prof.Cond.R. 1.15(e) as a violation of Prof.Cond.R. 1.15(c); however, the board's description of the rule that Westmeyer violated matches Prof.Cond.R. 1.15(e).

misconduct. As for mitigating factors, the parties stipulated and the board found that Westmeyer does not have a record of prior discipline and that he presented evidence of his good character and reputation.

{¶ 22} The parties stipulated that the appropriate sanction for Westmeyer's misconduct is an 18-month suspension with the entire suspension stayed on the conditions that he complete six hours of CLE in addition to the requirements of Gov.Bar R. X, with four hours focused on client-trust-account management and two hours focused on law-office management, and that he be required for a period of one year to work with a monitoring attorney appointed by relator to supervise his practice—particularly his compliance with client-trust-account rules. In support of that recommended sanction, they cited several cases in which we imposed conditionally stayed 18-month or one-year suspensions for comparable misconduct. *See Disciplinary Counsel v. Poley*, 2002-Ohio-1237; *Cleveland Metro. Bar Assn. v. Watson*, 2022-Ohio-2212; *Disciplinary Counsel v. Weber*, 2021-Ohio-3907; *Disciplinary Counsel v. Dockry*, 2012-Ohio-5014. But the board found that the misconduct at issue in those cases was "more pervasive and more egregious" than Westmeyer's misconduct in this case.

{¶ 23} Instead, the board found that the facts of two other cases in which we imposed six-month conditionally stayed suspensions for similar acts of misconduct—*Columbus Bar Assn. v. Keating*, 2018-Ohio-4730, and *Cincinnati Bar Assn. v. Jackson*, 2019-Ohio-4203—were more analogous to the facts of this case. The board therefore recommends that we suspend Westmeyer from the practice of law for six months with the entire suspension stayed on the conditions that he commit no further misconduct and complete six hours of CLE in addition to the requirements of Gov.Bar R. X, with four hours focused on client-trust-account management and two hours focused on law-office management.

**{¶ 24}** The parties filed joint objections to the board's recommended sanction and reassert that the proper sanction for Westmeyer's misconduct in this case is a conditionally stayed 18-month suspension.

## ANALYSIS

**{¶ 25}** We begin our analysis with the four cases that the parties cite in support of their proposed sanction of a conditionally stayed 18-month suspension—*Poley*, *Watson*, *Weber*, and *Dockry*.

**{¶ 26}** In *Poley*, the attorney withheld settlement funds to pay the medical bills of eight separate clients and failed to timely transmit those funds to the clients' medical-treatment professionals, as Westmeyer did in this case. Although he maintained a general business account and a client trust account, Poley used both accounts for personal and client-related expenses. For example, he deposited both personal and client funds into his business account and used that account to pay clients' medical bills and to distribute settlement proceeds to his clients. Poley also maintained personal funds in his client trust account and used the funds in that account to pay his personal credit-card bills. No aggravating factors were noted, and mitigating factors consisted of Poley's clean disciplinary record, his cooperation in the disciplinary process and expressed remorse, and his payment of restitution and resolution of his lax client-trust-account practices by the time of his disciplinary hearing. *Poley*, 2002-Ohio-1237, ¶ 7. We suspended Poley from the practice of law for 18 months and stayed the entire suspension on the condition that he abide by and renew his existing contract with the Ohio Lawyers Assistance Program. *Id.* at ¶ 9.

**{¶ 27}** Like Westmeyer, the attorney in *Watson* failed to prepare a settlement statement in one client's contingent-fee case, failed to promptly pay the medical bills of two clients out of their settlement proceeds, failed to perform monthly reconciliations of his client trust account, and failed to maintain required client ledgers. Watson also neglected four client matters and failed to reasonably

communicate with those clients, but there was no suggestion that his client-trust-account balance ever dropped below the amount that should have been held in trust for his clients, as Westmeyer's did in this case.

{¶ 28} Watson engaged in a pattern of misconduct involving multiple offenses but, unlike Westmeyer, did not harm a vulnerable client, *Watson*, 2022-Ohio-2212, at ¶ 14. As for mitigation, Watson had no prior discipline, did not act with a selfish or dishonest motive, made a timely, good-faith effort to make restitution, cooperated in the ensuing disciplinary investigation, and accepted responsibility for his misconduct. *Id.* at ¶ 15. We suspended Watson for one year, stayed in its entirety on the conditions that he complete six hours of CLE focused on law-office and client-trust-account management, serve a one-year term of monitored probation, and commit no further misconduct. *Id.* at ¶ 21.

{¶ 29} In *Weber*, the attorney received medical-payments-coverage checks payable to several of his personal-injury clients. Weber or a member of his staff signed the clients' names to two of those checks without the clients' authorization—purportedly for the convenience of the clients—and deposited them into his client trust account without informing his clients. When Weber left the firm where he had been employed, he did not transfer the medical-payment funds from his own client trust account to the firm's client trust account. And on at least one occasion, the balance in his client trust account dropped below $300, even though he should have been holding nearly $22,000 on behalf of several clients. Weber also deposited personal funds and earned fees into his client trust account, failed to timely withdraw one earned fee from that account, and failed to conduct monthly reconciliations of that account for more than two years. He delayed distributing settlement proceeds to his clients on at least three occasions, and when he finally made the distributions, his bank returned one of the checks for insufficient funds. While Weber was found to have violated Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit,

or misrepresentation), *see Weber*, 2021-Ohio-3907, at ¶ 9, the hearing panel in this case unanimously dismissed the allegation that Westmeyer had violated that rule.

**{¶ 30}** Aggravating factors in *Weber* consisted of a pattern of misconduct and multiple offenses. *Id.* at ¶ 16. As for mitigating factors, Weber had a clean disciplinary record, made restitution to all clients affected by his misconduct, cooperated in the disciplinary process, and submitted evidence of his good character and reputation. *Id.* We noted that although the evidence demonstrated that the balance in Weber's client trust account had dropped below the amount that he should have held on behalf of his clients, the board found no evidence that Weber had misappropriated the funds for his own benefit. On the contrary, Weber—like Westmeyer—"was simply not experienced in managing client funds in a client trust account when he started his solo practice," *id*. We suspended Weber from the practice of law for one year and stayed that suspension in its entirety on the conditions that he complete six hours of CLE focused on client-trust-account and client-fund management, commit no further misconduct, and pay the costs of his disciplinary proceedings. *Id*. at ¶ 21.

**{¶ 31}** In *Dockry*, the last of the cases advanced by the parties in support of their proposed sanction, the attorney failed to maintain client ledgers and to properly reconcile his client trust account for several years—much like Westmeyer did in this case. But unlike Westmeyer, Dockry also deposited and maintained personal funds in his client trust account, used that account to pay his personal and business expenses, and loaned himself and a friend money from that account for their personal use. In addition to committing three of the rule violations present in this case, Dockry stipulated that he had engaged in dishonest conduct and that his conduct adversely reflected on his fitness to practice law. However, Dockry committed only five rule violations, compared to Westmeyer's 14 rule violations. The sole aggravating factor was Dockry's dishonest or selfish motive. *Dockry*, 2012-Ohio-5014, at ¶ 23. In mitigation, Dockry had a clean disciplinary record,

made restitution, cooperated in the disciplinary proceedings, and submitted evidence of his good character. *Id.* Citing those factors and the corrective measures Dockry had taken to ensure that he did not repeat his misconduct, we concluded that a one-year suspension stayed in its entirety on the conditions that Dockry complete a one-year period of monitored probation and commit no further misconduct would adequately protect the public. *Id.* at ¶ 27.

{¶ 32} Of the two cases advanced by the board in support of its recommended sanction of a six-month conditionally stayed suspension, we find that the conduct that was at issue in *Keating* is most similar to the conduct at issue here.

{¶ 33} Like Westmeyer, Keating failed to maintain proper client-trust-account records, failed to remit payment to a chiropractor for treatment provided to several of his firm's personal-injury clients, and failed to inform his clients that he did not maintain professional-liability insurance. In addition, after Keating and the attorney with whom he practiced suspected that their accounting firm was stealing money from the law firm's client trust account, the two attorneys decided to leave their earned fees in their client trust account so they would have adequate funds to pay any client or third-party claims. Shortly before Keating bought out the other attorney's interest in the law firm, the two attorneys separated the trust-account funds into two accounts; in one of those accounts, they isolated the funds for which they could not identify an owner. Although Keating committed multiple offenses, he had a clean disciplinary record, did not act with a selfish or dishonest motive, made full restitution to the chiropractor who had treated his clients, modified his practices and procedures with respect to his client trust account, and cooperated in the disciplinary proceedings.

{¶ 34} Keating also hired a certified public accountant with a certification in financial forensics to analyze the firm's record-keeping policies and procedures and issue an opinion regarding the ownership of the funds for which Keating could not identify any owner. The forensic accountant concluded that the isolated funds

were most likely profits of the law firm and that it was unlikely that they were client funds. Furthermore, Keating testified that for at least six years, no one had made any claims to the funds for which he could not identify an owner. Apart from the problems with the payments to the chiropractor, there was no evidence that Keating or the other attorney had failed to pay any clients or third parties from one of their client trust accounts. Moreover, we found that Keating had acted in good faith to protect his clients and the rights of third parties who may have had claims against the funds. We suspended Keating from the practice of law for six months with the entire suspension stayed on the conditions that he serve a two-year period of monitored probation, obtain the assistance of someone with accounting expertise to ensure the proper management of his client trust account, and complete six hours of CLE related to client-trust-account management. *Keating*, 2018-Ohio-4730, at ¶ 33.

**{¶ 35}** Here, in contrast to the facts of *Keating*, the evidence shows that less than one month after Westmeyer deposited Mount's $100,000 settlement proceeds into his client trust account, he withdrew all but $46.22 of those funds for purposes entirely unrelated to Mount's case. The parties stipulated that Westmeyer "commingled funds by not having an account balance of at least $100,000.00 in his trust account" from the time he deposited Mount's settlement proceeds into his client trust account in December 2019 until he transferred those funds to Cuneo in August 2022, and the board made a similar finding.

**{¶ 36}** During his November 2023 deposition in this disciplinary proceeding, Westmeyer testified that he occasionally "ballparked" the amount of attorney fees or expenses he was owed in any given case and underestimated the amount to which he was entitled, leaving a portion of those funds in his client trust account. To the extent that Westmeyer left the fees he had earned in his client trust account while that account also contained funds belonging to clients, we agree that he improperly commingled personal and client funds, as stipulated by the parties

and found by the board. But to the extent that his client trust account contained less than the $100,000 it should have held on Mount's behalf, we find that Westmeyer's misconduct is more akin to misappropriation than commingling.

**{¶ 37}** On the record before us, however, it does not appear that Westmeyer's misappropriation of Mount's settlement proceeds was deliberate. *See Cleveland Bar Assn. v. Belock*, 1998-Ohio-261, ¶ 10 ("No circumstances ever justify the deliberate misappropriation of [a] client's funds for a lawyer's personal benefit."). Rather, like in the attorney in *Weber*, it appears that Westmeyer's misappropriation was the result of his own inexperience in managing a client trust account when he started his own practice.

**{¶ 38}** At his disciplinary hearing, Westmeyer testified that he worked with his father from the time he was sworn in as an attorney in 1999 until his father retired on March 1, 2017. During that time, Westmeyer was a signatory on the firm's client trust account, but it was his father who managed the account. After his father's retirement, Westmeyer opened his own firm and took over his father's pending cases. Although he opened a new business operating account, he kept his father's client trust account "for continuity." But unlike the attorney in *Keating*, Westmeyer never audited that client trust account or otherwise separated the funds between the old firm and his new firm. Westmeyer testified that he did not understand his responsibilities with respect to the client trust account under Prof.Cond.R. 1.15 before relator's investigation, though he acknowledged it was his obligation to do so.

**{¶ 39}** When asked why he did not do more to understand and manage the client trust account upon his father's retirement, Westmeyer stated, "I took over a law practice that had two practicing lawyers and went down to one. So I was initially busy, overwhelmed. And that led to just not following through with what I should have been doing." He also testified that at some point, the bank had switched to electronic statements and that he had not been logging into his online

account to look at them. He explained that he kept "a very crude accounting ledger" on the back of his check stubs to track the deposit and disbursement of client funds, and he expressed his belief that that practice kept him from overdrawing the account.

{¶ 40} With the assistance of counsel, Westmeyer took some steps to correct his client-trust-account-management mistakes by the time of his disciplinary hearing. He instructed the bank to send him paper statements and started reconciling those statements. He also started creating and maintaining account ledgers for his current clients. Westmeyer testified that by the time relator commenced its investigation, his father was unable to answer questions or assist him in conducting an audit of the client trust account because of cognitive decline. His father died on December 26, 2023. Westmeyer further explained that a $75,000 check he had issued from his client trust account in January or February 2020—which appears to have been drawn entirely from Mount's settlement proceeds—was used to make a payment in a case that had started when his father still practiced. During his November 2023 deposition—more than six years after his father's retirement—Westmeyer testified that he did not know if all the funds from his father's clients had been distributed but that he had not received calls from anyone looking for money.

{¶ 41} We find that Westmeyer's misconduct in this case is most comparable to, but more egregious than, the misconduct that was at issue in *Keating* and *Weber*. The evidence shows that because of his inexperience in managing a client trust account, Westmeyer essentially abdicated his duty to properly manage and account for the funds held in his client trust account for about four years after his father's retirement and that his failure to properly manage that account resulted in the misappropriation and misuse of $100,000 in client funds—more than four times the amount that Weber misappropriated for his own benefit, *see Weber*, 2021-Ohio-3907, at ¶ 13. And in contrast to the apparent misconduct of an outside

16

accounting firm in *Keating*, *see* 2018-Ohio-4730 at ¶ 11, Westmeyer himself was the source of the accounting irregularities in this case. Moreover, Westmeyer has not undertaken any effort to audit his client trust account as Keating did to determine whether his firm's clients have in fact received all the funds to which they are entitled, *see id.* at ¶ 14.

{¶ 42} On these facts, the conditionally stayed six-month suspension recommended by the board does not accurately reflect the seriousness of Westmeyer's misconduct. We conclude, however, that the 18-month suspension advanced by the parties, stayed in its entirety on the conditions recommended by the parties, will protect the public and provide Westmeyer with the proper tools and incentive to remedy the deficiencies in his accounting practices going forward.

## CONCLUSION

{¶ 43} Accordingly, Joseph William Westmeyer III is hereby suspended from the practice of law in Ohio for 18 months with the entire suspension stayed on the conditions that he (1) commits no further misconduct, (2) completes four hours of CLE focused on client-trust-account management and two hours of CLE focused on law-office management, in addition to the requirements of Gov.Bar R. X, and (3) serves a one-year term of monitored probation pursuant to Gov.Bar R. V(21), with the monitoring attorney to supervise Westmeyer's practice, including his compliance with client-trust-account rules. If Westmeyer fails to comply with the conditions of the stay, the stay will be revoked and he will be required to serve the full 18-month suspension. Costs are taxed to Westmeyer.

Judgment accordingly.

––––––––––––––––––

Margaret Mattimoe Sturgeon, Bar Counsel, and Christopher F. Parker, Assistant Bar Counsel, for relator.

Charles J. Kettlewell, for respondent.

––––––––––––––––––